# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IMAGEPOINT, INC. by JAMES R. MARTIN, SECURED CREDITOR, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | ) Case No: 13 C 4339 |
| | ) Magistrate Judge Susan E. Cox |
| BFS RETAIL & COMMERCIAL OPERATIONS, LLC., | )<br>) |
| Defendant. | ) |

## ORDER

For the reasons provided, defendant BFS Retail & commercial Operations, LLC's motion for summary judgment on ImagePoint, Inc.'s breach of contract count is denied [59]. ImagePoint's motion for partial summary judgment is granted in part and denied in part [64], and BFS' motion for partial summary judgment is granted in part and denied in part [61].

## STATEMENT

This action was originally brought in bankruptcy court to recover debts owed following an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. The present action is brought by James R. Martin on behalf of ImagePoint, LLC. Martin was the president of ImagePoint from 1986 until 2006, and then acted as its CEO until it abruptly closed its doors in 2009. Martin is a secured creditor of ImagePoint and was substituted as the plaintiff because he has the contractual right to collect on ImagePoint's accounts receivable.[1]

Defendant, BFS Retail & Commercial Operations, LLC, was a customer, having entered

---

[1] Jnt Statement of Facts, ¶7, dkt. 63.

1

into an agreement with Imagepoint for the repair, replacement and installation of "Firestone Complete Auto Care stores" signage. When ImagePoint filed for bankruptcy, there were unpaid invoices owed by BFS, and also unfinished work by ImagePoint (that BFS ultimately paid certain subcontractors to complete).

The parties have not completed discovery but, instead, filed a limited consent to proceed before Magistrate Judge Cox for a ruling on certain legal issues.[2] Now before us is BFS' motion for summary judgment on Count I of ImagePoint's complaint for breach of contract for failure to pay invoices. Also before us are the parties' cross motions for summary judgment on a few discrete issues: (1) whether BFS is entitled to attorney fees and expenses it incurred when it dealt directly with ImagePoint's subcontractors; (2) whether Martin can recover under the equitable theory of quantum meruit for certain unpaid invoices sent to BFS just prior to ImagePoint going into bankruptcy; and (3) whether BFS has valid set off claims for payments it made voluntarily to subcontractors whose lien rights had expired or were incapable of being perfected. For the reasons outlined, we find BFS' motion for summary judgment on Count I is denied [59]; ImagePoint's motion for partial summary judgment is hereby granted in part and denied in part [64], and; BFS' motion for partial summary judgment is granted in part and denied in part [61].

I.  **Background**

The basic history between the parties is relatively undisputed. The parties entered into a written Sign Maintenance Agreement on February 24, 2006 ("Agreement") that required ImagePoint to manufacture and install signage for BFS retail stores.[3] When ImagePoint ceased business operations in January 2009, and sought protection under bankruptcy laws, there were several subcontractors that demanded payment from BFS directly. BFS explains that many of the

---

[2] Dkt. 49, *see also* N.D. Ill. R. 73.1(d).
[3] Jnt Statement of Facts, ¶5, dkt. 63.

subcontractors asserted mechanics' liens – or threatened to do so – on the BFS properties. As the tenant at these locations, BFS was contractually obligated to clear all liens on the owner's title. BFS, therefore, negotiated and satisfied many of the claims of ImagePoint's subcontractors.[4]

## II. Breach of Contract

ImagePoint's breach of contract claim alleges that ImagePoint invoiced BFS for $1,128,007.45 in products and services that BFS has not paid. ImagePoint also argues that BFS failed to dispute those invoices within the applicable time period under the Agreement. BFS argues that summary judgment is warranted on this count because ImagePoint's failure to perform its obligations – by ceasing business abruptly in 2009 – defeats its claim.

The essential elements of a breach-of-contract claim in Illinois are: (i) the existence of a valid and enforceable contract, (ii) substantial performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) injury to the plaintiff as a result of the breach.[5] To survive summary judgment, ImagePoint must show sufficient evidence supports each of these elements.[6] BFS' motion rests on the argument that ImagePoint cannot show substantial performance of the Agreement because it was obligated to provide the agreed upon products and services through December 2010, which it did not do.[7] BFS explains that there were at least 18 locations where new signage was ready for installation but the subcontractors refused to proceed without guaranteed payment. Because BFS had to pay a substitute contractor to complete many of these projects, or pay ImagePoint's subcontractors directly, it argues that ImagePoint did not substantially perform on the Agreement.

ImagePoint argues two points in response: that the individual invoices are the relevant

---

[4] Jnt Statement of Facts, ¶20, dkt. 63.
[5] *Coghlan v. Beck,* 984 N.E.2d 132, 143 (1st Dist. 2013).
[6] *See Spitz v. Proven Winners North Am., LLC,* 759 F.3d 724, 730 (7th Cir. 2014)(citing rule that nonmoving party must make a sufficient showing on all essential elements of her case).
[7] Jnt Statement of Facts, ¶¶5, 18, dkt. 63.

3

contracts for purposes of its breach of contract count, not the Agreement, and; the issue of substantial performance is a question of fact, precluding summary judgment. We first address ImagePoint's argument that we must analyze this case much like those involving distribution agreements, where courts have found the purchase orders to be separate contracts. ImagePoint relies principally on *Echo, Incorporated v. Whitson Company, Incorporated.*[8] There, applying the Illinois version of the Uniform Commercial Code,[9] the court addressed the specific question of whether the particular distribution agreement between the parties expanded the right to set-off to include set-off against violations of the distribution agreement, not just a purchase order. This is analogous to our case in that BFS claims ImagePoint's violation of the Agreement (*i.e.,* failure to complete performance through the contracted end-date) is sufficient to set-off its liability to ImagePoint for unpaid invoices. ImagePoint would like us to find that the individual invoices, however, "created [ImagePoint's] rights to the purchase price [of the services] that [BFS] accepted, and the [Agreement] bestowed [ImagePoint] with the rights upon which it counterclaims."[10] This would mean that "[e]ach party's rights have their origins in different contracts..."[11] This stems from the rule that parties to a contract do not have the right to refuse performance because the other has breached a separate contract between them.[12]

But ImagePoint does not refer to any language in the Agreement, or in any of the unpaid invoices, that would confirm these are separate contracts. The cases involving distribution agreements that were separate and apart from the purchase orders distinguish the two, noting the distribution agreement contemplates sales, and the purchase orders specify "the price, type, and

---

[8] 52 F.3d 702, 705 (7th Cir. 1995).
[9] 810 ILCS 5/2-206(1); *see also* U.C.C. §2-217 (2012)(stating that a buyer "may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.").
[10] *See Echo, Inc.,* 52 F.3d at 708.
[11] *Id.*
[12] *See Rebaque v. Forsythe Racing, Inc.,* 480 N.E.2d 1338, 1341 (Ill.App. 1st Dist. 1985).

quantity of goods sold."[13] Here, however, the duration, price, and scope of the work is outlined in the Agreement. As BFS argues, the invoices appear to memorialize work performed pursuant to the Agreement.

Conversely, the common sense principle followed in *Echo* is that "a buyer must pay for the goods it accepts."[14] There is no dispute that BFS accepted goods and services from ImagePoint, through its subcontractors, but failed to pay for those goods and services.[15] And though the Agreement in this case outlines the price and type of goods and services being provided, indeed, only the specific invoices provide for the particular quantity, at any particular time or location, of the goods and services being provided.[16] ImagePoint's right to payment is through the individual invoices, which confirm that a particular service or good was provided. We, therefore, find that the invoices can be viewed as separate contracts apart from the Agreement, and are the relevant contracts for purposes of ImagePoint's breach of contract claim. ImagePoint's alleged failure to "substantially perform" its obligations under the Agreement because it went into bankruptcy does not, then, preclude its breach of contract count. Summary judgment is denied on this count.

### III. Quantum Meruit

We now move to the parties' cross motions for partial summary judgment. Both parties seek summary judgment on Count II for quantum meruit,[17] where ImagePoint claims that it should be paid for the value of work performed by subcontractors *who have not been paid by ImagePoint*. (ImagePoint alleges that BFS obtained a benefit from ImagePoint in the amount of

---

[13] *See Schieffelin & Co. v. Valley Liquors, Inc.,* 823 F.2d 1064, 1067 (7th Cir. 1987).
[14] *Echo, Inc.,* 52 F.3d at 705.
[15] Jnt Statement of Facts, ¶16, dkt.63.
[16] *See* Jnt Statement of Facts, exh. G, dkt. 63-7.
[17] Quantum meruit is Latin for "as much as deserved." *See e.g., Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir. 2005).

$1,128,007.45, but has not paid it). This count is pleaded in the alternative to Count I, which alleges BFS breached the Agreement when it failed to pay these same invoices.

BFS argues that recovery under a theory of quantum meruit is limited to the value of the goods and services ImagePoint itself conveyed, together with the value of goods and services provided by subcontractors *that have been paid by ImagePoint*. BFS explains that because Martin was released from any claims by the ImagePoint estate when the underlying bankruptcy case was settled, none of Martin's recovery will be returned to the ImagePoint estate for distribution to the subcontractors. BFS argues, then, that under Count II Martin would receive an inequitable windfall because the subcontractors did the work, but Martin would get to keep the money.

Quantum meruit is based on the implied promise of a recipient of services, in this case BFS, to pay for those services that were of value to it, "'as otherwise the recipient would be unjustly enriched.'"[18] In Illinois, a quantum meruit claim applies "where one party performs a service for another's benefit, the benefiting party accepts the benefit, and the circumstances surrounding the agreement indicate that the service was not intended to be gratuitous."[19] But in quasi-contract claims like quantum meruit, there is no actual agreement between the parties.[20] Rather, it is an implied duty to prevent injustice. To measure quantum meruit recovery, courts consider the lower of these two: "the economic cost to plaintiff of providing a benefit or the economic enrichment of defendant in receiving it."[21]

As BFS argues here, because ImagePoint did not pay its subcontractors for the work, the

---

[18] *System Development Integration, LLC v. Computer,* 739 F.Supp.2d 1063, 1086 (N.D. Ill. 2010).
[19] *See Midwest Emergency Assoc.-Elgin Ltd. v. Harmony Health Plan of Ill., Inc.,* 888 N.E.2d 694, 701 (Ill. App. 1st Dist 2008).
[20] *Utility Audit, Inc. v. Horace Mann Service Corp.,* 383 F.3d 683, 688-89 (7th Cir. 2004)(noting rule that parties where relationship is governed by contract may not recover on quantum meruit claims unless the claim falls outside the contract).
[21] *System Development Integration, LLC v. Computer Sciences Corp.,* 886 F.Supp.2d 873, 878 (N.D.Ill. 2012)(quoting *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.,* 907 F.2d 732, 745 (7th Cir.1990)).

economic cost to plaintiff in providing the benefit was zero. Because courts assess the lower of the two – cost versus benefit – ImagePoint's costs being zero would warrant no recovery.

But ImagePoint argues that by virtue of pass-through claims, it is permitted to pursue its subcontractor's claims directly. A pass-through claim is a claim (1) by a party that has suffered damages; (2) against a responsible party with whom it has no contract; (3) presented through in intervening party, such as a contractor, who has a contractual relationship with both.[22] The parties cite to one case where Illinois has recognized pass-through claims, finding that a "general contractor can sustain a cause of action for work done under a contract when it solicits a subcontractor to actually perform the work."[23]

The next question is whether the settlement reached in the bankruptcy proceedings affects the legal basis for recovery. BFS claims that it does, noting that pursuant to the settlement, none of Martin's recovery will be returned to the ImagePoint estate for distribution to the subcontractors. BFS further explains that ImagePoint's argument that it is allowed to pursue a pass-through claim is relevant only to ImagePoint's breach of contract count, not its quantum meruit count.

But BFS cites no support for the notion that pass through claims are only allowed under a breach of contract theory. And though ImagePoint does not dispute that recovery is solely for Martin's benefit, as a secured creditor, it explains that Martin's rights in the collateral exist to the extent of his claim. Should an amount in excess of his claim be recovered, ImagePoint explains that amount would revert to the debtor – ImagePoint's bankruptcy estate – because Martin is only allowed to collect the collateral that secures his claim. Despite BFS' argument to the contrary, ImagePoint asserts that it is the party in privity with the subcontractors and remains

---

[22] *Interstate Contracting Corp. v. City of Dallas,* 135 S.W.3d 605, 610 (Tex. 2004).
[23] *Paschen Contractors, Inc. v. City of Kankakee,* 819 N.E.2d 353, 361 (Ill. App. 1st Dist 2004).

contractually liable to them. BFS refers us to nothing in the bankruptcy proceeding, or the settlement, to refute this.

Ultimately, the inequity of allowing BFS to receive the value of work performed by ImagePoint's subcontractors without paying for such work is precisely the result quantum meruit is designed to avoid. We, therefore, find no legal basis for BFS's position that ImagePoint should be prohibited from seeking relief under quantum meruit, even for work performed by subcontractors who have not been paid by ImagePoint.[24]

## IV. Attorney Fees and Expenses

We next address whether the Agreement entitles BFS to the attorney fees and expenses it incurred in dealing with the unpaid subcontractors. This argument falls on whether the indemnity provision – and the coverage of attorney's fees therein – was intended to cover only losses incurred by third parties, or whether a loss imposed by ImagePoint would also fall within the provision. Applying Illinois law, the general rule is that an unsuccessful litigant is not responsible for the attorneys' fees of its opponent.[25] The exception to this rule is when a contract provides for the payment of attorneys' fees.[26] These, however, must be strictly construed, with the court determining the intention of the parties.[27]

The indemnification provision in the Agreement provides:

> To the fullest extent permitted by law, Image Point shall defend, indemnify and hold harmless Buyer and its respective officers, directors, agents and employees ("Indemnified Parties") from and against all claims, damages, losses and expenses, including but not limited to, attorney's fees, arising out

---

[24] *But see Keck Garrett & Assoc., Inc. v. Nextel,* 517 F.3d 476, 487 (7th Cir. 2008)(noting rule that resolution of a contract claim, however, disposes of a party's resort to quantum meruit because Illinois law does not allow a party to seek recovery on a theory of quasi-contract when an actual contract governs).
[25] *See Abdul–Karim v. First Fed. Sav. & Loan Assoc. of Champaign,* 101 Ill.2d 400, 411, 78 Ill.Dec. 369, 462 N.E.2d 488, 493 (1984) (losing party generally not liable for attorneys' fees).
[26] *J.B. Esker & Sons, Inc. v. Cle–Pa's P'Ship,* 325 Ill.App.3d 276, 281, 259 Ill.Dec. 136, 757 N.E.2d 1271, 1276 (2001).
[27] *J.B. Esker & Sons, Inc.,* 757 N.E.2d at 1276.

of or resulting from the acts or omissions of Image Point, its subcontractors, officers, directors, employees or agents in connection with the Agreement, excluding claims, damages, expenses or losses to the extent caused by the acts or omissions of an Indemnified Party.[28]

BFS argues that there is no dispute it was exposed to "claims," "losses," and "expenses," "arising out of or resulting from the acts or omissions of ImagePoint [and] its subcontractors" when it abruptly closed its doors and ImagePoint subcontractors walked off jobs. ImagePoint's failure to pay its subcontractors, and the resulting mechanics liens against several BFS properties, resulted in expenses being passed on to BFS. BFS seeks to recover those fees and costs incurred only in negotiating and clearing liens on its leased properties (not fees incurred as a creditor in the bankruptcy proceedings or as a defendant in this action).[29]

But ImagePoint offers two explanations for why this provision does not entitle BFS to recover attorney fees. First, ImagePoint asserts that another provision in the Agreement controls, Paragraph 10, which defines the parties' rights and obligations for a breach of the Agreement:

> **10. Default and Termination.** In the event either party breaches any of the terms of this Agreement and fails to remedy such breach within thirty (30) days after the non-defaulting party gives written notice thereof, the non-defaulting party shall have the right to terminate this Agreement by the giving of five (5) days prior to written notices to the defaulting party. In the event of any such termination, the non-defaulting party shall have available to it all remedies at law or in equity. In the event of termination BFS Retail & Commercial Operations, LLC shall pay to Image Point the following amounts without duplication.

ImagePoint argues that its alleged breach of the contract would not result in fees for BFS because of Paragraph 10's lack of fee shifting language, noting that the American rule follows the principle that each party bears its own expenses and fees unless expressly written otherwise.[30] Therefore, it argues that without explicit language indicating that the non-breaching party is

---

[28] Agreement, ¶15.3, dkt. 63-1.
[29] *See* Def's Mt. for Partial Summ. Jdmt., ¶4(a), dkt. 61.
[30] *See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.,* 73 F.3d 150, 152 (7th Cir. 1996)(noting the use of the "standby rule," where common law controls when an agreement is silent).

entitled to attorney's fees, read together with the indemnification provision, the Agreement as a whole shows the intent of the parties was not to provide for attorney's fees.

But this argument requires a reading that silence – on the duty to pay fees and costs in Paragraph 10 – eliminates the application of such a duty (should it exist) in the indemnification provision. It is true that we must construe the Agreement as a whole, "viewing each part in light of the others."[31] But we also must ascribe "meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage."[32]

To evaluate the meaning of these two provisions, we address ImagePoint's second argument. Here, ImagePoint relies on *Open Kitchens, Inc. v. Gullo International Development Corporation*,[33] where the Illinois appellate court analyzed a similar indemnification clause. In that case, the plaintiff entered into an agreement with defendant for certain construction, the defendant employed subcontractors, and because of a failure on the part of the subcontractors there was damage to the structure.[34] That court analyzed nearly the same indemnification provision, with the exception of the last sentence:

> To the extent permitted by law, [Gullo] shall indemnify and hold harmless the [plaintiff] and their [sic] agents and employees from and against all claims, damages, losses, expenses, liabilities, and demands, including attorneys' fees, of whatsoever kind or nature, arising out of, resulting from or connected with the performance of the Work by the Contractor or any Subcontractor for and in [sic] behalf of the [plaintiff] or Architects. *The Contractor shall defend at its own expense, any actions based thereon and shall pay all attorneys' fees, costs and other expenses arising therefrom.*[35]

In that case, the plaintiff argued that this provision constituted a promise by the contractor to pay all losses caused by the sub-contractors. The court found that though "the first sentence, read

---

[31] *Curia v. Nelson,* 587 F.3d 824, 829 (7th Cir. 2009).
[32] *Id.*
[33] 466 N.E2d 1313 (Ill.App.Ct. 2004).
[34] *Open Kitchens, Inc.,* 466 N.E2d at 1314.
[35] *Id. (*emphasis added).

10

alone, may fairly be read to provide" such coverage, "the next sentence indicates that the indemnity was intended to arise only in the context of liability imposed on plaintiff as a result of losses or injuries incurred by third parties."[36]

In our case, ImagePoint believes this case supports its position that the indemnification clause in the Agreement was intended to arise in the context of liability imposed on BFS as a result of losses incurred by third parties *only*, and not a warranty clause relating to the performance of ImagePoint. ImagePoint explains that the language in the indemnification provision in this case similarly excludes "claims, damages, expenses or losses to the extent caused by the acts or omissions of an Indemnified Party."[37]

But BFS argues that this language refers to BFS as the indemnified party, meaning only claims or expenses *caused by BFS* are excluded. BFS claims the difference between the two cases is the exclusionary language: in *Open Kitchens* the limitation is payment for losses incurred by third parties only, and in this case the limitation relates only to when it is BFS who breached.

ImagePoint, however, argues that BFS's interpretation would result in an unreasonable outcome because ImagePoint would be required to indemnify BFS on the very complaint ImagePoint is pursuing. ImagePoint then references a case where this precise argument was outlined, *PacifiCorp v. SimplexGrinnell, LP*. Though outside this district, *PacifiCorp* is similar to this case. There the court noted,

> [t]here was no provision in the parties' contract that expressly provided for an award of attorney fees to the prevailing party in the event of an action, or other dispute between the parties, for a breach of the contract. However, defendant contended that the indemnification clause in the contract … entitles plaintiff to attorney fees against defendant, because the indemnification clause specifically states that defendant agrees to indemnify plaintiff for

---

[36] *Id* at 1315.
[37] Agreement, ¶15.3, dkt. 63-1.

all costs and damages, *including attorney fees* arising out of the performance or nonperformance of the contract.[38]

This is the identical argument made in this case. And, similar to our case, the indemnification provision there stated,

> "[Defendant] specifically and expressly agrees to indemnify, defend, and hold harmless [plaintiff], its officers, directors, employees and agents (hereinafter collectively 'Indemnitees') against and from any and all claims, demands, suits, losses, costs and damages of every kind and description, *including attorneys' fees and/or litigation expenses,* brought or made against or incurred by any of the Indemnitees to the extent resulting from or arising out of any negligence or wrongful acts of [defendant], its employees, agents, representatives or subcontractors of any tier, their employees, agents or representatives in the performance or nonperformance of [defendant's] obligations under this Contract or in any way related to this Contract.[39]

The Oregon appellate court reviewed both parties' interpretations, noting that the defendant's position – that the indemnification provision contained a fee-shifting provision for actions between the parties – would lead "to absurd results" because the defendant would have to "'indemnify, defend, and hold harmless' plaintiff."[40] The court stated that "[i]n practical terms, regardless of the merits or outcome of defendant's claims against plaintiff, defendant would be required to indemnify plaintiff," which would be "an unreasonable result" that the parties did not likely intend.[41]

Though the same rationale is applicable here, and we acknowledge is one an Illinois court may well follow, there are also examples rejecting this approach. We highlight one case, involving an indemnity provision in a lease agreement. In *Rexam Beverage Can Company v. Bolger,* the defendant sought attorneys' fees pursuant to indemnification provision, which stated,

---

[38] *PacifiCorp v. SimplexGrinnell, LP,* 256 Or.App. 665, 668, 303 P.3d 949, 951 (Or.App. 2013).
[39] *Id*.
[40] *Id* at 672, 303 P.3d at 953.
[41] *Id*.

> Lessee agrees to indemnify and save harmless Lessor ... against and from any and all liabilities, losses, damages, costs, expenses, causes of action, suits, judgments and claims by or in behalf of any person, firm, corporation or governmental authority arising from the occupation, use, possession, conduct [ ... ] or [any] tiling whatsoever done in or about the Premises ... during any term of this Lease ... and against all liabilities ... arising from any failure by Lessee to perform any of the agreements, terms, covenants or conditions of this lease .....[42]

Finding the indemnification provision to be "a comprehensive indemnity clause that indicates an intent to do everything possible to mandate complete compensation," the defendant was entitled to recover all legal expenses so as to be made whole.[43] Notably, the Court found no Illinois precedent for plaintiff's argument that indemnity clauses, as a matter of law, apply only to third parties.[44]

Illinois, therefore, does not universally conform to the "approach followed by the majority of states," that would require indemnification clauses to exclude direct actions unless specifically intended by the parties.[45] The majority standard is based on the principle that "a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own

---

[42] *Rexam Beverage Can Co. v. Bolger,* No. 06 C 2234, 2008 WL 5068824, *1 (N.D. Ill. Nov. 25, 2008).
[43] *Id.*
[44] *Id* at 2.
[45] *See Nova Research, Inc. v. Penske Truck Leasing Co., L.P.* 408 Md. 435, 458, 952 A.2d 275, 288-89 (2008)(adopting the approach "followed by the majority of states," requiring the contract provide expressly for recovery in first party enforcement actions); *see also Luna v. American Airlines,* 769 F.Supp.2d 231, 243-44 (S.D.N.Y. 2011)(noting the general standard that when contractual language does not expressly contemplate that the contracting parties were concerned with prospective litigation between themselves, the indemnification provision will not cover it); *Travelers Indem. Co. v. Dammann & Co.,* 594 F.3d 238, 255 (3d Cir. 2010)(noting that first-party indemnification claims are not categorically barred, but interpreting the indemnification language to require third-party liability "for the clause to be triggered."); *NevadaCare, Inc. v. Dep't of Human Servs.,* 783 N.W.2d 459, 471 (Iowa 2010)(analyzing the split of authority, but ultimately finding that "a party to a contract cannot use an indemnity clause to shift attorney fees between the parties unless the language of the clause shows an intent to clearly and unambiguously shift the fees."); *but see Am. Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Authority,* 125 F.3d 420, 433 (7th Cir. 1997)(finding it reasonable that indemnity clause did not cover exclusively third-party claims).

attorney's fees ...."[46] But as analyzed by *Rexam*, "indemnity" is "'designed to make the wronged party whole,'" and the definition itself "contains no suggestion that the harm indemnified against must involve a third party."[47]

The result in Illinois has been indemnity language reviewed differently by different courts. The same language deemed limited to third parties has – in other cases – been interpreted to apply to direct claims.[48] One court concluded the interpretations were "so varied, that each case will turn on the particular language used, and the particular factual setting to which the indemnification clause is sought to be applied."[49]

Here, the indemnification provision does not expressly limit itself to third party claims, nor does it expressly include direct claims. But because Illinois law does not require that indemnification suits arise solely in the context of third-party claims, we find no reason to extend that limitation in this case. Furthermore, this indemnification agreement does not contain additional provisions "which unmistakably relate to third-party claims," such as requiring notice to be given to the indemnitor.[50] On its face, the language is sufficiently broad to cover expenses

---

[46] *See Luna v. American Airlines,* 769 F.Supp.2d 231, 243-44 (*citing Hooper Assoc., LTD. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 367, 548 N.E.2d 903 (1989), *and, e.g., Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 199 (2d Cir.2003); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20–21 (2d Cir.1996)).
[47] *Rexam Beverage Can Co.,* No. 06 C 2234, 2008 WL 5068824 at *2.
[48] *Compare Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.,* No. 93 C 3065, 1995 WL 275594, 3 (N.D. Ill. May 8, 1995)(finding indemnification language "agrees to indemnify, save, defend and hold [Balcor] and the [Balcor] Related Parties harmless from and against any losses, debts, obligations, proceedings, suits, claims, causes of action, damages, costs, expenses (including, without limitation, attorneys' fees and expenses) liabilities…" not to apply only to litigation with a third party) and *Chamberlain Mfg. Corp. v. Maremont Corp.,* 1995 WL 769782, *6 (N.D. Ill. Dec. 29, 1995)(finding that the plain language of the contract "clearly contemplates" an action between the two parties, because the indemnification provision stated that the seller indemnified the purchaser and agreed " 'to hold indemnitee harmless from any and all damage, loss, liability and expense, including reasonable attorneys fees'" arising out of "misrepresentation or any breach of warranty…") with *Hallmark Ins. Adm'rs, Inc. v. Colonial Penn Life Ins.,* 697 F.Supp. 319, 328 (N.D. Ill. 1988), *aff'd* 990 F.2d 984 (7th Cir. 1993)(noting that the language suggested that it was limited to only third party actions).
[49] *Balcor,* No. 93 C 3065, 1995 WL 275594 at 3 (comparing two cases, stating that "some language in each indemnification clause may be similar," but "the intent of the parties may be different, and the clauses must be evaluated according to the language used in the entire section.").
[50] *See, e.g., Hooper,* 74 N.Y.2d at 492-93, 549 N.Y.S.2d at 367, 548 N.E.2d 903(holding that the limitation to third-party suits affords a fair meaning to all of the language in the contract and "leaves no provision without force and

incurred by BFS in defending against claims as a result of a breach by Imagepoint. BFS was exposed to "claims," "losses," and "expenses,"[51] when ImagePoint failed to pay its subcontractors. BFS may, therefore, seek to recover those fees and costs incurred in negotiating and clearing liens on its leased properties.

V.     Setoff Rights

Both parties also seek summary judgment on whether BFS may set off the direct payments it made to ImagePoint subcontractors after ImagePoint closed its doors. BFS argues that it can set off the full amount it paid directly to ImagePoint subcontractors, yet ImagePoint asserts that BFS can only set off payments made to subcontractors with valid perfected mechanics lien claims. (BFS has stipulated that some subcontractors did not have perfected mechanics' liens).[52]

The crux of ImagePoint's argument is that these payments to subcontractors were voluntary. In other words, ImagePoint argues that BFS is prohibited from asserting a setoff for payments it made to subcontractors whose lien rights had expired, or were not properly perfected. But BFS rightly points out that though "bankruptcy courts are hesitant to allow setoff for voluntary payments because such payments may interfere with priority of debt in bankruptcy," here we are not concerned with issues of priority in bankruptcy.[53]

ImagePoint then makes the additional argument that a setoff counterclaim must be "limited to damages arising out of the same contract as the claim for the goods."[54] Going back to the argument that distribution agreements and the purchase orders that arise under them are

---

effect.").
[51] Agreement, ¶15.3, dkt. 63-1.
[52] Jnt Statement of Facts, ¶21, dkt.63.
[53] *See Citadel Group Ltd. v. Washington Regional Medical Cnt,* No. 07 cv 1394, 2009 WL 1329217 at *4 (N.D. Ill. May 13, 2009)(citing same case as ImagePoint and finding voluntary nature of payment irrelevant because case was not in bankruptcy).
[54] *Inspec Foams, Inc. v. Claremont Sales Corp.,* 2002 WL 1765630, *2 (N.D. Ill. July 30, 2002).

15

different contracts, ImagePoint again argues that "the price of the goods a buyer accepts pursuant to a purchase order is not susceptible to set-off against damages the buyer sustains as a result of a seller's alleged breach of a related distributorship agreement."[55] BFS provides no argument on this point, other than to say that the setoff claims relate to the one Agreement.

We have already explained, for purposes of ImagePoint's breach of contract count, that the invoices themselves can reflect separate, allegedly breached, contracts. Even applying this principle here, BFS' right to a setoff is not foreclosed. Because each invoice – or each location where ImagePoint was contracted to install signs for BFS – must be analyzed individually for purposes of the breach of contract claim, a setoff claim relating to those locations (*i.e.,* where BFS paid subcontractors directly) would be appropriate.

But BFS argues that it may set off the full amount it paid directly to ImagePoint subcontractors, not just those relating to the invoices at issue in this litigation. Without help from BFS, we continue the analysis. The Seventh Circuit provides some history to the doctrine of setoffs. A claim for setoff is "essentially a 'counterdemand based on some transaction entirely extrinsic to the plaintiff's cause of action.'"[56] It has been described as the ancestor of the permissive counterclaim, and a permissive counterclaim "by definition arises from a different contract or other transaction or occurrence from the main claim, and a setoff, so far as relevant here, is just a subset of the permissive counterclaim."[57] This means that a setoff claim can only survive if it is a claim that is enforceable independent of the plaintiff's action.[58]

We find BFS could have a separate, independent, action for the work that did not get completed by Imagepoint, regardless of whether subcontractors had valid perfected mechanics

---

[55] *Echo, Inc.,* 52 F.3d at 705.
[56] *See Citadel Group Ltd.,* No. 07 cv 1394, 2009 WL 1329217 at *4 (*quoting CIPA Mfg. Corp. v. Allied Golf Corp.,* No. 94 C 6574, 1995 WL 337022, *2 (N.D.Ill. June 1, 1995)); *see also Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1440 (7th Cir.1993)).
[57] *Coplay Cement Co.,* 983 F.2d at 1441.
[58] *Citadel Group Ltd.,* No. 07 cv 1394, 2009 WL 1329217 at *4.

16

lien claims. BFS paid for the same work twice. It is, therefore, entitled it to seek restitution. There is no reason, then, that it should be precluded from setting off that amount. This is the same principle that a buyer may deduct part of the damages "'resulting from any breach of the contract from any part of the price still due under the same contract.'"[59]

## VI. Conclusion

We find that ImagePoint's failure to perform its obligations under the Agreement – by ceasing business abruptly in 2009 – does not defeat its claim for breach of contract. BFS' motion for summary judgment on ImagePoint's breach of contract count is, therefore, denied [59]. Regarding the parties' cross motions for summary judgment, we find the indemnification provision in the parties' Agreement entitles BFS to attorney fees and expenses it incurred when it dealt directly with ImagePoint's subcontractors. We find that Martin may seek recovery under the equitable theory of quantum meruit for certain unpaid invoices sent to BFS just prior to ImagePoint going into bankruptcy, and that BFS has valid set off claims for payments it made voluntarily to subcontractors whose lien rights had expired or were incapable of being perfected. ImagePoint's motion for partial summary judgment is, therefore, granted in part and denied in part [64], and BFS' motion for partial summary judgment is granted in part and denied in part [61].

**ENTERED:**

Date: <u>December 19, 2014</u>  /s/ Susan E. Cox
U.S. Magistrate Judge

---

[59] *See Schieffelin & Co. v. Valley Liquors, Inc.,* 823 F.2d 1064, 1067 (7th Cir. 1987)(quoting section 2-217 of the Uniform Commercial Code).